# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| 10526 Pico Vista Road, Downey, California 90241 **Subject Premises 1** | ) ) ) | Case No.   2:21-mj-04561 |
| | ) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B-1*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 846 & 841 | Distribution, possession with intent to distribute controlled substances and conspiracy to do so |
| 18 USC 1956, 1957 | Money Laundering and conspiracy to do so |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

_____
Bryan Bussen, Task Force Officer, United States Postal Inspection Service
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's  signature*

City and state: <u>Los Angeles, CA</u>          Alka Sagar, United States Magistrate Judge
_____
*Printed name and title*

AUSA: Shawn J. Nelson (Ext. 5339)

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The premises to be searched is 10526 Pico Vista Road, Downey, California 90241 ("**SUBJECT PREMISES 1**").  The residence is a one-story home comprised of a two-tone tan stucco exterior with a tan colored Spanish tile roof.  The numbers "10526" are clearly labeled on a column on the front porch.

**SUBJECT PREMISES 1** includes any parking spaces, garages, storage spaces, mailboxes, appurtenances, and locked containers, such as safes, vaults, file cabinets, drawers, luggage, briefcases, boxes, cans, bags, purses, and trash cans.  **SUBJECT PREMISES 1** also includes any vehicles located on, or are immediately adjacent to, **SUBJECT PREMISES 1**.



## ATTACHMENT B-1

**ITEMS TO BE SEIZED FROM SUBJECT PREMISES 1**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy and possession with intent to distribute controlled substances) and Title 18, United States Code, Sections 1956 and 1957 (Money Laundering and Conspiracy to Commit Money Laundering) (the "Subject Offenses"), namely:

a.    U.S. Mail, Express Mail, and Priority Mail delivery confirmation slips, labels and associated boxes, books, records, receipts, records, and other papers concerning the distribution of controlled substances;

b.    Currency, money orders, bank checks, or similar financial instruments or devices in quantities over $1,000;

c.    UPS, FedEx, or other private shipping service documents concerning the transmittal of illegal narcotics including delivery confirmation slips and associated boxes, books, records, receipts, notes ledgers, and other papers, including any computerized or electronic records;

d.    Documents, correspondence, messages, books, payout sheets, records, receipts, pharmacy records and/or receipts, insurance card information and receipts, or correspondence, notes ledgers, address and/or telephone books, photographs other papers, or computerized or contact lists concerning the conspiracy to distribute controlled substances;

e.   Documents, records, statements, communications, and receipts concerning any of the following:  bank accounts, credit cards, money drafts, letters of credit, pharmacy or drug store purchases, wire transfers, money orders and cashier's checks, receipts, business accounts, securities, travelers checks, stock certificates, bonds, certificates of deposit, safety deposit boxes, brokerage accounts, real estate shell corporations, and business fronts, that would indicate the obtaining, secreting, transfer, concealment and/or expenditure of money;

f.   Up to ten items that show indicia of occupancy, residency, ownership, possession and/or use of the SUBJECT PREMISES in question;

g.   Travel records, including passports, visas, airline tickets, boarding passes, printouts from online reservations and airline ticket receipts;

h.   Surveillance, or other audio or video recording equipment; any surveillance footage and/or storage devices, and any recordings made with surveillance equipment, whether kept on or off site;

i.   Items of value and documents pertaining to the proceeds of illegal narcotics distribution, including automobile titles, deeds to property, as well as evidence of financial transactions concerning obtaining, transferring, secreting or spending large sums of money;

j.   Packaging materials, including pill bottles, pill crushers, plastic baggies, vacuum seal type bags or plastic,

cardboard boxes, packing peanuts, plastic wraps, plastic containers, masking or sealing tape, metal cans, and canning devices;

k.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

l.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

           vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

           vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

           viii.    records of or information about Internet Protocol addresses used by the device;

           ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of

vi

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7. During the execution of this search warrant, law enforcement is permitted to: (1) depress James Johnson-Polk's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which

ix

specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of James Johnson-Polk's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

## <u>AFFIDAVIT</u>

I, Bryan Bussen, being duly sworn, declare and state as follows:

### I.  <u>INTRODUCTION</u>

1.  I am a Task Force Officer (TFO) with the United States Postal Inspection Service (USPIS).  I have been assigned as a Task Force Officer with USPIS for approximately ten months.  I have been assigned to the Contraband Interdiction and Investigation (CI2) Team.  I have completed available training by the USPIS in the investigation of controlled substances or proceeds/payments being transported through the United States. Prior to my assignment with the USPIS, I have accrued approximately 13 years of law enforcement experience. During my career, I have conducted numerous narcotics investigations as a Narcotics Detective with the Florissant Police Department. A position in which I have approximately two years of experience. While assigned as a Detective, I received extensive training in narcotics investigations.

2.  I have completed thousands of hours of criminal investigations, including compiling information, interviewing victims, witnesses, and suspects, and collecting evidence to support the filing of criminal complaints.  I have worked with other experienced state and federal law enforcement officers and supervisors and have gained valuable knowledge and experience from them.  My work has involved supervising, preparing, and assisting in the planning and service of numerous search warrants.  I have received training in the investigation of drug trafficking activities that use the USPS.  As part of my law

enforcement duties, I have supervised, lead, and conducted
parcel investigations that have resulted in the arrest of
individuals who have received and distributed illegal drugs, as
well as the seizure of illegal drugs and drug-sale proceeds.

## II. PURPOSE OF AFFIDAVIT

3.     This affidavit is made in support of applications to
search the following premises:

a.     10526 Pico Vista Road, Downey, California 90241,
"**Subject Premises 1**" more fully described in Attachment A-1; and

b.     8732 Meadow Road, Downey, California 90242,
"**Subject Premises 2**" more fully described in Attachment A-2.

4.     The requested search warrants seek authorization to
seize evidence, fruits, or instrumentalities of violations of
Title 21, United States Code, Sections 841(a)(1) and 846
(conspiracy to distribute and possess with intent to distribute
controlled substances) and Title 18, United States Code,
Sections 1956 and 1957 (Money Laundering and Conspiracy to
Commit Money Laundering), (hereinafter the "subject offenses")
as described in Attachments B-1 and B-2.  Attachments A-1, A-2,
B-1, and B-2 are incorporated herein by reference

5.     The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

6.    I am part of an experienced team of narcotics investigators currently investigating the criminal activities of a drug trafficking organization operating in Mexico; Los Angeles, California; St. Louis, Missouri; Illinois; Mississippi; Indiana; and multiple other states within the U.S.  This investigation has identified James Johnson-Polk (AKA: "James Johnson") as a leading member of the Johnson-Polk Drug Trafficking Organization (DTO) and is responsible for the distribution of kilogram quantities of fentanyl, cocaine, and marijuana.

7.    Since August 2018, the USPIS, IRS-CI, and the DEA, have been conducting a criminal investigation into Johnson-Polk and both his known, and unknown, criminal associates for ongoing violations of the subject offenses.

8.    The investigation began when the USPIS in St. Louis identified a large number of USPS Money Orders purchased in and around St. Louis that were later negotiated in and around Los Angeles.  At the time of this affidavit, the USPIS has identified no less than $446,400.00 in USPS Money Orders that have been structured in the St. Louis area and negotiated in Los Angeles.  A portion of these money orders were negotiated by Johnson-Polk, and others by both known and unknown co-conspirators involved in this investigation.  At the onset of the investigation, the USPS Money Orders being negotiated in the

Los Angeles area primarily displayed the payee name of "James Johnson" with the payee's address listed as **Subject Premises 2.** The investigative team has identified **Subject Premises 2** as being owned by Charlene Johnson, the mother of Johnson-Polk.

9.   Between February 2017 and July 2019, the purchase of these USPS Money Orders corresponded with USPS mailings from the St. Louis area to Johnson-Polk, at his then address of 11201 Otsego Street, Apartment 316, North Hollywood, California 91601. As noted below, the USPIS executed three federal search warrants on packages in transit to this address and seized one of the packages that contained $28,500.00 in U.S. Currency. The investigation revealed that after this package was seized, Johnson-Polk began receiving packages containing suspected and confirmed drug proceeds at **Subject Premises 1**.  As explained in detail within this affidavit, Johnson-Polk uses the USPS, United Parcel Service (UPS), and FedEx to traffic and ship drugs to the greater St. Louis area.  Johnson-Polk also uses the same shipping services to have suspected and confirmed drug proceeds, USPS Money Orders, and bulk U.S. Currency shipped back to him at both **Subject Premises.**

10.   In or around June 2019, the USPIS identified suspected and confirmed packages containing U.S. Currency and USPS Money Orders that were being mailed to Subject Premise A.  This includes the USPIS seizure of $32,000.00 in U.S. Currency mailed to **Subject Premises 1**, and the Indiana State Police seizure of $25,000.00 in U.S. Currency also mailed to **Subject Premises 1.** Two controlled purchases were made from Johnson-Polk and he

requested the proceeds from the purchase be mailed to **Subject Premises 1**, which they were.  The investigative team has also confirmed through legal records that Johnson-Polk owns **Subject Premises 1**, and as described in the financial investigation section of this affidavit, is believed to have committed fraud in his financial/loan application during the purchase **Subject Premises 1**.

11.  After the June 2019 seizures of U.S. Currency in transit to **Subject Premises 1**, a large number of similar packages began to be mailed to **Subject Premises 2**.  Between February 2020 and July 2021, no less than fifty packages suspected to contain drug proceeds have been identified as being shipped to **Subject Premises 2**.  These fifty packages only include packages mailed through the USPS and do not include private shipping companies, which investigators have confirmed that Johnson-Polk also uses to transport drug proceeds and drugs

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Identification of Johnson-Polk as a Drug Trafficker**

1.   <u>Subject Package 1</u>

12.  On August 31, 2018, the Honorable United States Magistrate Judge David Noce issued a search warrant for Priority Mail package 9505 5152 6842 8241 3551 94 (Subject Package 1). Subject Package 1 was mailed from Los Angeles to St. Louis and was found to contain metal containers that contained several pounds of marijuana.  The contents of the seized package were submitted to the USPIS Forensic Laboratory and eleven fingerprints belonging to Johnson-Polk were recovered, as well

as nine fingerprints of an identified and known co-conspirator,
Johnnye Ramos.

> 2.    Subject Packages 2, 3, and 4

13.  As noted above, the address of 11201 Otsego Street,
Apartment 316, North Hollywood, California 91601 was initially
identified as receiving packages suspected of containing U.S.
Currency, money orders, and drug proceeds mailed from St. Louis
to Johnson-Polk.  The USPIS identified no less than seventy-five
packages mailed to this address between February 2017 and
October 2018, which coincided with the structured purchase of
large quantities of USPS Money Orders in the St. Louis area.
Knowing that drug traffickers will routinely use the same
address to receive monetary proceeds from drug sales until
intercepted or interrupted by law enforcement, Inspector Jordan
Wicks sought to identify what these packages contained.
Specifically, Inspector Wicks sought to conduct a search of
several of these packages, identify the contents, and then
return them to the mail stream without the sender or receiver
being aware the package had been searched.

14.  On October 16, 2018, the Honorable United States
Magistrate Judge Shirley Mensah issued a search warrant for
Priority Mail Express package EK869985329US (Subject Package 2).
This package was mailed from St. Louis to Johnson-Polk 11201
Otsego Street, Apartment 316, North Hollywood, California 91601.
Of importance is that the phone number listed on the package for
Johnson-Polk was (818) 919-4842, which was confirmed through
legal process to be subscribed to him.  A search of this package

revealed $5,000.00 in USPS Money Orders and $2,000.00 in Western Union Money Orders, for a total of $7,000.00.  This package was resealed and later delivered to Johnson-Polk's residence.

15.   On October 24, 2018, the Honorable United States Magistrate Judge Patricia Cohen issued a search warrant for Priority Mail Express package EE253558692US (Subject Package 3). This package was mailed from St. Louis to Johnson-Polk at the address of 11201 Otsego Street, Apartment 316, North Hollywood, California 91601.  Johnson-Polk's known cell phone number was again listed with his name (James Johnson) as the recipient.  A search of Subject Package 3 revealed $7,000 in USPS Money Orders and $2,000.00 in Western Union Money Orders, totaling $9,000.00. This package was resealed and later delivered to Johnson-Polk's address.

16.   Between October 2018 and June 2019, approximately twenty-three additional packages were identified as being mailed from St. Louis to Johnson-Polk's then-address of 11201 Otsego Street, Apartment 316.  As previously noted, I am aware that, based on training and experience, that drug traffickers will often use the same address to receive drug proceeds until this is interrupted, often by law enforcement seizing a package containing drug proceeds.  Those involved in drug trafficking and money laundering through shipping services will often switch shipping services when this occurs.  It is my belief that the seizure of Priority Mail package 9505 5121 4061 9187 3151 73 (Subject Package 4) is what led to the use of **Subject Premises 1**

and **Subject Premises 2** to begin to receive packages suspected and confirmed to contain drug proceeds.

17.   On July 9, 2019, the Honorable United States Magistrate Judge John Bodenhausen issued a search warrant for Subject Package 4.  Subject Package 4 was mailed from St. Louis to "K. Johnson" at 11201 Otsego Street, Apartment 316, North Hollywood, California 91601.  The sender's address was listed as 1757 Keelen Drive, St. Louis, Missouri 63136.  A search of Subject Package 4 revealed sealed metal cans which contained $28,500.00 in U.S. Currency.  The contents of this package were sent to the USPIS Forensic Laboratory and thirteen fingerprints belonging to Steven Sampler, a previously identified co-conspirator, were recovered.  Unlike Subject Packages 2 – 3, Subject Package 4 was seized as evidence and never delivered to Johnson-Polk's residence.

3.   **Subject Premises 1**; Subject Packages 5-9

18.   On September 25, 2019, Inspector Wicks traveled to Columbia, Missouri and coordinated with Confidential Source 1[1] (hereinafter "CS1") regarding the controlled purchase of one pound of marijuana for $2,200.00  CS1 had been provided the address for James Johnson of 10526 Pico Vista Road, Downey, California 90241 (**Subject Premises 1**), in which to mail the money to.  According to CS1, Johnson-Polk would then mail the pound of marijuana to an address provided to him.  A total of

---

[1] CS1 has one felony conviction for a non-drug related offense. He/she voluntarily provided information against self-interest and information he/she has provided has been corroborated by recorded calls, financial records, controlled buys, USPS business records, and through various means.

four USPS Money Orders were purchased, totaling $2,200.00.
Inspector Wicks then mailed a USPS Priority Mail Express package
(Subject Package 5) containing the structured USPS Money Orders
to Johnson-Polk at **Subject Premises 1**.

19.   On September 27, 2019, members of the Indiana State
Police were working to identify and interdict packages suspected
of containing drugs and drug proceeds at a shipping company in
Indianapolis, Indiana.  Upon doing so, they identified a package
displaying tracking number 780080957155 (Subject Package 6).
Subject Package 6 was addressed to "Jay Johnson" at **Subject
Premises 1** and displayed the known phone number for Johnson-
Polk, (818) 919-4842.  The Indiana State Police verified Subject
Package 6 was originally mailed from St. Louis.  A state search
warrant was obtained for this package and it was found to
contain a sealed metal can with $25,000.00 in U.S. Currency.  It
should be noted that the investigative team was unaware of this
seizure until approximately one year later.  However, the
investigative team at the time noted that suspected money
packages stopped going to **Subject Premises 1** and were then being
sent to **Subject Premises 2**.

20.   In October 2019, Inspector Wicks was contacted by CS1
who advised the one pound of marijuana purchased from Johnson-
Polk was in transit to the address in the Eastern District of
Missouri previously provided to Johnson-Polk.  CS1 provided
Inspector Wicks with the UPS tracking number for this package
(Subject Package 7), thus further confirming Johnson-Polk was
using other shipping companies, which the investigative team

believes to be due to the seizure of Subject Package 4 and Subject Package 6.  After obtaining the package, Inspector Wicks found one sealed metal can containing one pound of marijuana. The contents were submitted to the USPIS Forensic Laboratory which identified nine latent fingerprints belonging to Johnnye Ramos.

21.  On April 2, 2020, Inspector Wicks identified Priority Mail package 9505 5115 1253 0092 8213 50 (Subject Package 8) that was mailed from Springfield, Illinois to **Subject Premises 1**. On April 6, 2020, USPIS Inspector Rex Castro obtained a federal search warrant for Subject Package 8 in the Central District of California.  Upon conducting a search of Subject Package 8, it was found to contain $32,000.00 in U.S. Currency concealed within stereo speakers.

22.  On April 13, 2020, Inspector Wicks again coordinated with CS1 regarding the purchase of one pound of marijuana from Johnson-Polk.  Inspector Wicks again structured the purchase of four USPS Money Orders, totaling $2,000.00, for this purchase. Inspector Wicks then mailed the money orders Priority Mail Express to Johnson-Polk at **Subject Premises 1**.  Johnson-Polk was additionally provided an address within the Eastern District of Missouri to mail the marijuana to.   On April 16, 2020, Inspector Wicks received a UPS package (Subject Package 9) that had been mailed to this address.  Subject Package 9 contained one metal can containing approximately one pound on marijuana. The USPIS Forensic Laboratory later recovered six latent

fingerprints from Subject Package 9 belonging to Johnnye Ramos from.

23.  In July 2021, members of the investigative team interviewed Cooperating Defendant 1[2] (hereinafter "CD1") regarding his/her role in the Johnson-Polk DTO. CD1 confirmed Johnson-Polk was a drug trafficker and distributed kilogram quantities of fentanyl, cocaine, and marijuana.  CD1 advised Johnson-Polk shipped the drugs to CD1 through the USPS and private shipping companies, and in turn, CD1 would ship bulk U.S. Currency to Johnson-Polk at 11201 Otsego Street, Apartment 316, North Hollywood, California 91601, **Subject Premises 1**, and **Subject Premises 2**.

24.  CD1 confirmed that bulk U.S. Currency had previously been seized in transit to Johnson-Polk at **Subject Premises 2** [Subject Package 6 and 8].  Therefore, CD1 began to travel to Los Angeles and deliver bulk U.S. Currency to Johnson-Polk at **Subject Premises 2** on numerous occasions. CD1 also confirmed Johnson-Polk would fly to St. Louis every several weeks to pick up bulk U.S. Currency and then return to California.

4.  **Subject Premises 2**

25.  As previously mentioned in this affidavit, Johnson-Polk was initially found to be receiving packages at 11201 Otsego Street, Apartment 316, suspected of, confirmed to be,

---

[2] CD1 has multiple felony convictions for drug related offenses. He/she voluntarily provided information against self-interest and information he/she has provided has been corroborated by financial records, USPS business records, surveillance, and various other means. CD1 has provided information, which has been corroborated, in exchange for prosecutorial consideration in this investigation.

containing U.S. Currency and other drug proceeds.  After Subject
Package 4 was seized, Johnson-Polk began receiving a large
number of packages suspected and confirmed to contain U.S.
Currency and other drug proceeds at a new location, **Subject
Premises 1**.  Around the time that Subject Package 8 was seized
(while in transit to **Subject Premises 1**), Johnson-Polk then
began receiving a large amount of packages in a similar fashion
at an additional location, **Subject Premises 2**.

26.  Between January and September 2018, the USPS tracked
the purchase of $60,000.00 in USPS Money Orders.  The USPS Money
Orders were purchased in zip codes of the greater St. Louis area
and made payable to James Johnson, 8732 Meadow Road, Downey
California 90242 (**Subject Premises 2**).  The USPS Money Orders
were purchased in $1,000.00 amounts and the purchases appeared
to be structured in order to avoid law enforcement detection.
On multiple occasions, the USPS Money Orders were purchased from
separate USPS Post Offices on the same day and the amount of
purchases exceeded $3,000.00.  Thus, it appears this was done to
avoid showing identification and to avoid the filing of a Funds
Transaction Report.  Several of the USPS Money Orders were
purchased by known and identified  co-conspirators of the DTO.

27.  Between February 2020 and July 2021, investigators
identified no less than fifty packages, suspected of containing
U.S. Currency or other drug proceeds, mailed to **Subject Premises
2**. Twenty-six of these packages originated from the greater St.
Louis area, including Illinois.  The remaining packages
originated from non-narcotic source states, including Alabama,

Indiana, and Mississippi.  The overall combined weight of the packages mailed to **Subject Premises 2** is in excess of 120 pounds.

**B.    Arrests of James Johnson-Polk and Steve Sampler; Identification of Subject Package 10**

28.    In May 2021, Inspector Wicks learned that Johnson-Polk had been arrested on August 10, 2020 by the Downey Police Department in Los Angeles, California, for a drug related offense.  Inspector Wicks obtained a copy of the Downey Police Report (VT00140-509-20) which detailed the arrest of Johnson-Polk.  On the date of his arrest, Johnson-Polk was the subject of a traffic stop for traffic related offenses.  The reporting officer described how Johnson-Polk appeared nervous and refused to exit the vehicle when informed to do so by law enforcement.  Johnson-Polk accessed one of two cell phones within the vehicle, used FaceTime to call an unknown number, and then left the phone call connected in the car prior to obeying law enforcement commands and exiting the vehicle.  A probable cause search of the vehicle led to the seizure of bulk U.S. Currency, one kilogram of cocaine, as well as two cellular telephones.  As detailed below, a review of Sampler's cellular device revealed that Johnson-Polk and Sampler conspired to obtain this kilogram of cocaine, and it is believed this kilogram of cocaine was destined for St. Louis, Missouri.

29.    On June 3, 2021, Inspector Wicks was contacted by TFO D. Sebek and TFO K. Kesterson, DEA-St. Louis, regarding a package that had been interdicted at a UPS sorting facility in

13

St. Louis.  The package was identified as 1Z 03Y 394 02 9160
9747 (Subject Package 10).  Subject Package 10 was mailed from
Los Angeles to 1757 Keelen Avenue, St. Louis, MO 63136.  As
previously noted, this was listed as the sender's address on
Subject Package 4 which was previously mailed by Sampler, found
to contain $28,500.00, and seized in transit to Johnson-Polk.
Subject Package 10 was found to contain one kilogram of fentanyl
concealed within a sealed metal can, which is consistent with
the previous inbound and outbound seizures associated with the
Johnson-Polk DTO.

    30.  On June 3, 2021, the USPIS and DEA conducted a
controlled delivery of Subject Package 10 to the address of 1757
Keelen Dr, Saint Louis, Missouri 63136.  Investigators observed
an individual take possession of Subject Package 10.  The person
was detained shortly thereafter, and he/she confirmed he/she had
picked up Subject Package 10 for Sampler.  It was also
determined that he/she was actively on the phone with Sampler
when approached by law enforcement.  He/she agreed to contact
Sampler to tell him to come to the residence (1757 Keelen Drive)
in order for him to take possession of Subject Package 10.
Sampler later responded to 1757 Keelen Drive to take possession
of the Subject Parcel he believed contained one kilogram of
fentanyl.  Sampler was taken into custody without incident and
conveyed to the St. Louis County Police Department for further
investigation.  Sampler declined to provide a statement to law
enforcement, however, provided written consent to search his
cellular device, as well as the passcode to unlock it.

**31.**   The investigative team conducted a review of Sampler's cellular device and identified two phone numbers for Johnson-Polk.  The first number, (818) 919-4842, was listed under the contact of "Jay," and previously confirmed to be subscribed to Johnson-Polk.  The second number, (818) 290-0589 (Johnson-Polk), was saved under the contact name of "JB."  From reviewing text message communication between Sampler and (818) 290-0589, the number sent Sampler a photograph of mail with the name James Johnson listed as the recipient of the mail.  Based on this, and the investigation to date, it is my belief the person utilizing phone number (818) 290-0589 is in fact James Johnson-Polk.

**32.**   Sampler and phone number (818) 290-0589 (Johnson-Polk) exchanged numerous text messages between August 17, 2020, and June 3, 2021, the date of Sampler's arrest.  It is important to note that the start date of the text messages was seven days after Johnson-Polk was arrested with one kilogram of cocaine and his cellular devices were seized.  In my training and experience in conducting large scale investigations into drug traffickers and drug trafficking organizations, this is consistent with Johnson-Polk's arrest and the seizure of the devices seven days prior.  Individuals arrested or identified by law enforcement will often obtain new "burner" phones, establish new phone numbers, and/or obtain new cellular devices when previous devices are seized or identified by law enforcement.  Sampler sent Johnson-Polk fictitious names and the address of 1757 Keelen Drive, St. Louis, Missouri 63136 on no less than three occasions.  It is my belief this was to provide an address in

which to have packages containing drugs sent to, consistent with
the package containing the one kilogram of fentanyl.

     **33.**   The following is selected portions of text message
communication between Sampler and (818) 290-0589 (Johnson-Polk)
on June 3, 2021, the date of Sampler's arrest:

> Sampler:  She got it
> Johnson-Polk:  Ok
> Sampler:  She's not making any sense right
> Johnson-Polk:  [He/she] called you
> Sampler:  This was when 12 [law enforcement] showed up
>         (Sampler attached a screen shot of the call
>         between the person who initially took the
>         package and Sampler)
> Sampler:  This when I said [he/she] was stumbling
>         [Sampler attached a screen shot of the call
>         between the person who initially took the
>         package and Sampler]

     **34.**   The above listed communication coincided with the
initial detention of the person who took custody of the package
containing the one kilogram of fentanyl.  Sampler and Johnson-
Polk additionally communicated through FaceTime numerous times
during the events leading up to Sampler's arrest.  I know
through my training and experience in conducting package related
investigations that the initial recipient of the package
containing drugs is often not the person the package was
intended for.  This serves as a means to insulate drug
traffickers from law enforcement detection by creating a buffer.
It is my belief the above communication between Sampler and the
person I believe to be Johnson-Polk was to determine if the
recipient of the package had been compromised by law
enforcement.

**35.**   I conducted a review of text message communication between Sampler's cell phone number and phone number (818) 919-4842, which was previously confirmed as belonging to Johnson-Polk and to be subscribed in his name.  The following text messages occurred between Sampler and Polk prior to the events in the preceding paragraph, between July 27, 2020, and August 3, 2020:

> 07/27/20:
> Johnson-Polk:  J. Johnson 8732 meadow rd Downy ca 90242 [**Subject Premises 2**]
> Sampler:  "Liked" J. Johnson 8732 meadow rd Downy ca 90242 [**Subject Premises 2**]
>
> 07/28/2020:
> Sampler:  [Sent a screen shot photograph of UPS package 1Z2FV2371297943431, with expected delivery date of 07/30/2020.]
> Johnson-Polk: [Sent a Zillow link to address 5210 Louisiana Ave., St. Louis, MO 63111]
> Johnson-Polk: [Sent a Zillow link to address 4600 Tennessee Ave., St. Louis, MO 63111]
>
> 07/29/2020:
> Johnson-Polk:  My bad I needed mermac address
> Sampler:  House address
> Johnson-Polk:  Yeah
> Sampler:  2832 Meramec St St Louis MO 63118-4536
>
> 07/30/2020:
> Sampler:  Did everything go ok…?
> Sampler:  Questioned "Did everything go ok…?"
> Johnson-Polk:  Yes sir
>
> 07/31/2020:
> Sampler:  You want to speak to Mexicano.  Machelo sent you.
> Sampler:  [Screen shot image of Mexican based phone number +52 1 686 194 1113]
> Sampler:  [Screen shot image showing him actively speaking with a +55 phone prefix [country code for Brazil]]

```
08/01/2020
Johnson-Polk: [Sent a picture of a large amount of
               currency from an unknown country]
Johnson-Polk: [Sent picture of a FedEx receipt,
               reflecting it was mailed from 8616 Firestone
               Boulevard, Downey, California 90241. The
               image reflects the package weighed 25.60
               pounds and was mailed to "S Sampler 2832
               MERAMEC ST St. Louis, MO 63113]
Sampler:     Ok

08/03/2020
Sampler:     What address
Johnson-Polk: Same one [**Subject Premises 2**]
Sampler:     [Sent picture of an unknown vehicle]
Sampler:     Grind Mobile
Sampler:     Did you get a location
Sampler:     [Sent a picture of UPS receipt for tracking
               number 1Z2FV2371299805872. The receipt
               reflects it cost $104.88 to mail the package
               to "J. Johnson 8732 MEADOW RD DOWNEY, CA
               90242-3912"]
```

36.  Regarding the above communication, it is my belief
that Johnson-Polk provided Sampler the address of **Subject
Premises 2** in which to mail U.S. Currency or proceeds from drug
trafficking.  Between the time that Sampler sent the tracking
number to Johnson-Polk, numerous addresses were provided in
which I believe were to arrange the location to have drugs
delivered to in St. Louis.  On the day of the reported UPS
delivery, Sampler stated to Johnson-Polk, "Did everything go
ok…?," which Johnson-Polk confirmed.

37.  I conducted a review of text message communication
between Sampler and WhatsApp phone number (909) 697-9053
(hereinafter "Unknown").  This communication occurred between
August 4, 2020, and August 11, 2020.  As previously noted in
this affidavit, Johnson-Polk was arrested with one kilogram of

cocaine on August 10, 2020.  It is my belief that the below communication describes Sampler coordinating the purchase of fifty kilograms of cocaine, although Johnson-Polk initially only purchased one kilogram of cocaine.  In my training and experience in conducting narcotic investigations, the use of the word "T-shirt" in this context represents one kilogram of cocaine:

```
08/04/2020:
Sampler:  What up
Unknown:  Hola
Unknown:  Como esta??!!
Unknown:  Habla espanol?
Sampler:  No senor muy poco espanol
Unknown:  O speak very little ingles
Unknown:  I'll be there in downy today to see your friend
Unknown:  5 pm
Unknown:  I will have somebody who speak English
Unknown:  To translate for me
Sampler:  Ok he's ready
Unknown:  Ok I'll see you guy there
Sampler:  Appreciate ya looking forward
Sampler:  Send location to my cuzn 8189194842 [Johnson-
          Polk]
Unknown:  Yes I will
Unknown:  [sent a picture of Stonewood Center, 251
          Stonewood St, Downey, CA 90241]
Unknown:  The office is 5 min away
Sampler:  What up Buddy he's there
Unknown:  I'll be there in 15 min
Sampler:  He's there waiting
Unknown:  12302 bellflower blvd, downy CA 90242
Unknown:  [sent a picture of a pin drop location]
Unknown:  I have a black ram 4 doors

08/09/2020:
Unknown:  Hola!!
Unknown:  I'm gonna pick some T-shirts tomorrow morning
Unknown:  You guys still want them??

08/10/2020
Sampler:  I don't know you would have to reach out to
          him…
```

```
Sampler:    Any plans on brining the fifty shirts Mexicano
            said he was gonna let Machelo try out in my
            town at the boys and girls club…?
Unknown:    Good morning, I talked to your guy and he wants
            to buy 3 shirts today..
Sampler:    Make sure the material is the same as the
            shirts he tried on last week….!!!!
Unknown:    Of course my friend
Unknown:    He can check them by himself
Sampler:    Cool what about coming to the Midwest I have
            a nice place that you can stay in while I work
            on the design for more shirts…???
Unknown:    Good..what's the city?
Sampler:    St Louis
Sampler:    My cousin [Johnson-Polk] is the real deal we
            don't play games…we are REAL no need for all
            the games…he's ready with the invoice…
Unknown:    I understand. I already showed were ready with
            shirts
Sampler:    Ok so what the problem he says you got him
            going to Walmart and now you want to go
            somewhere else and he said you want to see the
            invoice first…!!!!
Sampler:    We are real my friend no games let's build a
            relationship so that we all can vacation
            together at some point…!!!!
Unknown:    We have the material. We choose Walmart to see
            if you
            guys were ready. We have to material ready to
            go.
Sampler:    Ok he's waiting on you guys ready to get the
            show going
Unknown:    We told your cousin we were ready but he said
            he didn't have the invoice and wanted to see
            the material first
Sampler:    He's on his way back
Sampler:    My guy [Johnson-Polk] got pulled over soon as
            he left you guys
Unknown:    For what??
Sampler:    I heard them put a dog in his vehicle
Unknown:     Wtf
Sampler:    Yes Sir
Sampler:    No Fn good…
Sampler:    Did you guys drive around to see if it was
            close by
Unknown:    No amigo we went to eat something
Unknown:    Because I thought just was a normal traffic
```

```
                    stop
         Unknown:   But I think it's more serious
         Sampler:   Yes I think so
         Unknown:   Just to let you know, I just sold 1 shirt
```

38.  At 5:45 PM CST is when Sampler sent the message "He's on his way back."  From reviewing the arrest report of Johnson-Polk, he was pulled over at approximately 6:10 PM CST.  At 6:24 PM CST Sampler sent the message "My guy got pulled over soon as he left you guys."  As previously mentioned in this affidavit, Johnson-Polk refused to exit the vehicle, placed a FaceTime call, and then exited the vehicle.  Based on Sampler stating "I heard them put a dog in his vehicle," I believe that Johnson-Polk called Sampler on FaceTime during Johnson-Polk's arrest. Sampler and phone number (909) 697-9053 (Unknown) continued to send several text messages back and forth over the next several hours, discussing what occurred.  On the same date, at 8:53 PM CST, Sampler sent a message that stated, "There attorney say it was CHP so not sure what's going on but they took his phone so make sure your house is clean it happened really close to where he met you."

39.  As described above, Johnson-Polk was found to be in possession of at least two telephones, one of which was likely a "burner phone" used to communicate with a much smaller number of callers than the phone number known to belong to Johnson-Polk ((818) 919-4842). I know from my training and experience that those engaged in drug trafficking will frequently possess and use what are colloquially referred to as "burner phones." These phones are often prepaid devices, or listed in the name of a

customer other than the actual user, as a means to disguise the phone's true user. "Burner phones" allow a drug trafficker to distance themselves from the device, making it more difficult to be detected by law enforcement. These phones are used to facilitate drug trafficking activities, and also afford the user the ability to segment their various trafficking related communications across several devices, thus obfuscating the nature and extent of their communications. I also know that these phones are sometimes cycled in and out of usage to frustrate law enforcement attempts to intercept a given device's communications.

### V.    <u>Financial Investigation</u>

40.  As noted, the investigative team previously identified Steven Sampler, who resides in St. Louis, as a member of the Johnson-Polk DTO.  On April 25, 2002, Sampler was indicted for possession with the intent to distribute a substance containing cocaine base, Case No 4:02 CR 212 JCH.  Sampler plead guilty and was sentenced to 120 months on or about November 22, 2002. After completing his prison sentence, Sampler filed a motion for early termination of his probation and supervised release. In the motion, Sampler stated he was able to purchase and rehab a HUD home using the FHA 203K loan program.

41.  The investigative team researched public databases and the Missouri Secretary of State in reference to Sampler and determined that on or about May 30, 2013, Sampler organized Andae Investment Group LLC in the State of Missouri.  Andae Investment Group LLC is addressed at 2920 Meramec Street,

#18631, St. Louis, Missouri 63118.  The investigative team knows this address to be a United States Post Office.  According to the Articles of Organization, the purpose of Andae Investment Group LLC is to buy, rent, rehab, and sell property.  On or about May 18, 2017, Sampler converted Andae Investment Group, LLC to Andae Investment Group, Inc., located at the same address.  Sampler is listed as the registered agent.  Sampler listed his son, Ryshad Sampler, as one of the incorporators. Sampler listed his address as 2832 Meramec, St. Louis, MO 63118. Ryshad Sampler's address is listed as 4611 Korte, St. Louis, MO 63118.  According to the Articles of Incorporation, Andae Investment Group, Inc. is still listed as being created to buy, lease and rehab property.

42.  On or about October 9, 2019, Sampler organized Central Ave Clothing Store, LLC addressed at 2920 Meramec Street, #18631, St. Louis, Missouri 63118.  As noted, this address is a United States Post Office.  According to the Articles of Organization, the purpose of Central Ave Clothing Store, LLC is for all legal things permitted in the State of Missouri. Sampler listed himself as the registered agent.  The members of the business were listed as Sampler at 2920 Meramec Street, #18631, St. Louis, Missouri 63118 and Johnson-Polk at 10526 Pico Vista Road, Downey CA 90241 (**Subject Premises 1**).  It was requested that the filed document be returned to Johnson-Polk at **Subject Premises 1**.

**A.    Together Credit Union**

43.   Members of the investigative team subpoenaed and
analyzed the records from Sampler's accounts maintained at
Together Credit Union (Formerly known as American Eagle Credit
Union / Anheuser Busch Employee Credit Union)

44.   In 2013, Sampler opened a Small Business Savings and a
Small Business Checking account for Andae Investment Group, LLC
at Together Credit Union.  The account number was identified as
583822.  According to the business resolution filed with
Together Credit Union, Andae Investment Group, LLC was addressed
at 2920 Meramec #18631, St. Louis, Missouri, and Sampler listed
himself as the owner of the entity.  Senior Financial
Investigator Robert J. Anderson (herein "SFI Anderson") reviewed
the Together Credit Union account records for Andae Investment
Group, LLC account 583822 for the period May 2014 through
December 2018.

45.   Andae Investment Group, LLC account 583822 consisted
of a Business Savings account 583822-00 and a Small Business
Checking 583822-90.  However, due to the limited number of
unique transactions that went through Andae Investment Group,
LLC Business Savings account 583822-00 your agents have omitted
the analysis of Business Savings account 583822-00.  The review
and analysis of these Andae Investment Group, LLC Small Business
Checking account 583822-90 revealed the following:

46.   From May 2014 through December 2018, there were total
deposits of $554,139 deposited to Andae Investment Group, LLC
Small Business Checking 583822-90 at Together Credit Union.  The

24

deposits consisted of cash, checks, merchant credits, account transfers and miscellaneous items.  The chart below summarizes the deposits made to Together Credit Union Andae Investment Group, LLC Small Business Checking account 583822-90.

| Year | CASH | % of Total Deposits | CHECK | % of Total Deposits | UNKNOWN | % of Total Deposits | Total Deposits |
|------|------|---------------------|-------|---------------------|---------|---------------------|----------------|
| 2014 | $ 21,165.00 | 66% | $ 2,139.52 | 7% | $ 10,546.14 | 33% | $ 32,192.94 |
| 2015 | $ 77,828.00 | 70% | $ 11,093.09 | 10% | $ 22,537.98 | 20% | $ 111,459.01 |
| 2016 | $ 101,829.00 | 78% | $ 11,468.07 | 9% | $ 17,083.55 | 13% | $ 130,380.62 |
| 2017 | $ 92,390.00 | 73% | $ 13,171.52 | 10% | $ 20,847.73 | 16% | $ 126,409.25 |
| 2018 | $ 73,805.00 | 48% | $ 47,769.23 | 31% | $ 32,141.77 | 21% | $ 153,716.73 |
|  | $ 367,017.00 |  | $ 85,641.43 |  | $ 103,157.17 |  | $ 554,158.55 |

a.   Between May 2014 and December 31, 2018, on 54 separate occasions, Sampler wired a total of $220,380.00 from his Andae Investment Group, LLC account 583822-90 to accounts Johnson-Polk controlled at Citibank (8 transactions / $44,220.00) and El Monte Community Credit Union (46 transactions / $176,160.00).  In 52/54 instances, the wire transfers were made to Johnson-Polk's accounts immediately following a large cash deposit of a similar amount into Sampler's account.

b.   In addition, between January 23, 2014 and May 21, 2015, Sampler structured $21,900.00 in payments to Johnson-Polk, 8732 Meadow Road, Downey CA 90241 (**Subject Premises 2**) through one or more money service business (i.e. Western Union, Money Gram, Walmart's RIA Wire Transfer Services, etc).

47.  Based upon information described above, the investigative team researched public databases in reference to Johnson-Polk and **Subject Premises 1**.  As a result of the search, your agents learned that on or about April 19, 2017, Jose J. Ezpinoza and Luz Maria Espinoza, Husband and Wife as Joint

25

Tenants (Grantors) executed a Grant Deed in order to grant Johnson-Polk, a single man, the real property known as **Subject Premises 1**.  In addition, the investigative team learned that on or about June 27, 2017, Johnson-Polk, a single man, (Borrower) entered into a Deed of Trust with American Financial Network, Inc., dba Orion Lending (Lender) for a note in the amount of $603,000.00, plus interest, and Johnson-Polk has promised to pay this debt in regular periodic payments and pay the debt in full no later than July 1, 2047.  This note is secured by the real property located at **Subject Premises 1**.

48.  The investigative team obtained the Uniform Residential Loan Application that Johnson-Polk completed in order to obtain the $603,000.00 note.  According to the loan application, Johnson-Polk listed his Social Security Number as "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" and his Date of Birth as "October 21, 1982" and listed his telephone number as "(818) 919-4842."  Johnson-Polk indicated that the purpose of the loan was to finance the purchase of a primary residence located at **Subject Premises 1**. At the time he completed the application, Johnson-Polk indicated he was living at 11201 Otsego Street, # 316, North Hollywood, CA 91601.  Johnson-Polk indicated he was renting the residence and had lived there for four years.  Johnson-Polk listed that he had seventeen years of schooling and had four dependents.  However, Johnson-Polk did not list any employment.  Instead, Johnson-Polk indicated that he received other income, in the form of alimony and child support in the amount of $18,000.00.

49.   In the Asset and Liabilities section of the loan application, Johnson-Polk listed the following assets: a $34,000.00 cash deposit towards the residence; Citibank Account 5616 with a balance of $1,615.00; Citibank Account 5124 with a balance of $20,065.00; and a Harbor Credit Union Account #590 with a $10,129.00 balance.  Johnson-Polk's total liquid assets totaled $89,709.00.  Johnson-Polk listed the following liabilities:  a loan (Loan # 50185E00042801) with an unpaid balance of $29,526.00 from El Monte Community Credit Union; a loan (Loan # 5018F0042804) with an unpaid balance of $24,216.00 from El Monte Community Credit Union; four Department of Education Loans totaling $37,255.00; and other debit totaling $38,108.00, resulting in total liabilities of $126,017.00.

50.   According to the details of the loan transaction, the purchase price of **Subject Premises 1** was $670,000.00.  After the additions of prepaid items and estimated closing costs the total cost of the residence was estimated to be $685,587.56.  After deductions for Johnson-Polk's $34,000.00 escrow deposit, estimated credits, and the $603,000.00 loan, it was estimated that Johnson-Polk would need to come up with $45,992.40 at closing.  Although the investigative team does not have the closing records from the Escrow company at this time, it is assumed Johnson-Polk came up with the funds to close the transaction since the loan granted and the Deed of Trust was filed.

51.   Based on an investigative review of the mortgage payment records, it was determined that from on or about January

27

12, 2018 through January 19, 2021, Johnson-Polk has made loan payments toward the repayment of loan #8013388052 in the amount of $171,241.26.  These mortgage payments were made out of the following accounts:

| Financial Institution | Account Number | Account Type | Amount |
|---|---|---|---|
| Citibank | 42021565124 | Checking | $8,640.90 |
| Citibank | 42003778505 | Checking | $39,670.37 |
| Citibank | 42021565116 | Checking | $21,602.25 |
| El Monte Credit Union | 33562 | Checking | $101,327.74 |

52.  In addition, based on the investigative team's review of the mortgage loan and servicing records, your agents know that monthly statements, real estate tax escrow statements, real estate insurance records, and Internal Revenue Service Forms 1098 were sent to Johnson-Polk at **Subject Premises 1** through the United States Mail Service and/or Commercial Carrier.

53.  In July 2021, your agents subpoenaed El Monte Community Credit Union (herein "EMCCU") for all account records in reference to Johnson-Polk from January 2013 to the present. According to the records provided, Johnson-Polk opened member account #50185 at EMCCU on or about January 27, 2006.  At the time he opened the account, Johnson-Polk indicated that he resided at 11803 Monrovia, Lynwood CA 90262.  From January 2013 through May 2021, Johnson-Polk has used the address 8732 Meadow Road, Downey, CA 90242 (**Subject Premises 2**).  On or about March 2020, Johnson-Polk added Tiffany Hausey to his EMCCU account.

From the investigation, your agents know that Tiffany Hausey is Johnson-Polk's girlfriend/paramour.

54.   In your agent's review of Johnson-Polk's EMCCU account, your agents confirmed the credit wire transfers made from Steven Sampler to Johnson-Polk's EMCCU account, identified the deposit of United States Postal Service Money Orders into the account, and identified a significant number of structured cash deposits into Johnson-Polk's EMCCU account.

55.   Included in those deposits were checks from Famers Insurance Fire Insurance Exchange checks (Check # 1605972408 dated January 14, 2020, in the amount $1,096,77 and Check # 1626658949 dated March 4, 2020 in the amount of $2170.52) addressed to James Johnson, 10526 Pico Vista Road, Downy CA 90241 (**Subject Premises 1**), check (Check # 6267793 dated January 6, 2021 in the amount of $773.66) from PennyMac Loan Services Escrow Disbursement check addressed to James Johnson, 10526 Pico Vista Road, Downy CA 90241 (**Subject Premises 1**).   In addition, there were a number of Chase Bank Cashier's Checks payable to James Johnson that list Tiffany N. Hausey as the Remitter. Below is a summary of those checks:

| Date Deposited | Date Purchased | Check Number | Amount | Payee |
|---|---|---|---|---|
| 10/13/2020 | 10/13/2020 | 1161148206 | $14,077.81 | James Johnson |
| 11/25/2020 | 11/25/2020 | 9601204871 | $14,117.98 | James Johnson |
| 01/12/2021 | 01/12/2021 | 1161149165 | $14,117.98 | James Johnson |

56.   Based on the information above, your agents obtained Tiffany Hausey's Chase Bank records for the years January 2016

through July 2021.  According to the records provided, Hausey had the following accounts that were responsive to the subpoena:

a.   Account 876017500 in the name Tiffany N. Hausey, opened January 7, 2010 with an address of 5030 S. Harvard, Los Angeles, CA 90062,

b.   account 2967479268 in the name Tiffany N. Hausey opened September 4, 2010 with an address of 5030 S. Harvard, Los Angeles, CA 90062, and

c.   account number 686878627 in the name Tiffany N. Hausey, opened September 8, 2020 with an address of 211 E 92nd Street, Los Angeles, CA.

57.  For the purposes of the search warrant, your agents will only be discussing Account 876017500 opened January 7, 2010 in the name Tiffany N. Hausey and account number 686878627 in the name Tiffany N. Hausey, opened September 8, 2020.  It should be noted that in November 2020, Hausey changed the address on account number 686878627 to 10526 Pico Vista Road, Downey, CA 90241, **Subject Premises 1.**

58.  A review of the account activated for Account 876017500 revealed that Hausey received payroll checks from a dentist's office in Santa Monica, CA through July 2020.  On or about July 21, 2020, Hausey received a credit of $137,400.00 to Account 876017500 raising her account from $4,240.88 to $141,640.88.  According to the account statement, the credit came from SBAD 310 Payment.  You agents know that a SBAD Treas 310 payment signifies a loan payment made on behalf of the Small Business Administration to businesses facing financial hardships

due to the Covid-19 Pandemic.  You agents did a search of public records and external public databases at their disposal and did not find a business in which Hausey had an ownership interest. It has recently come to your agents' attention that drug traffickers and members of their organization have been taking advantage of this loan program in order to fund their illegal organizations.  Shortly after this deposit, Hausey made a number of structured cash withdrawals from Account 876017500 in the name Tiffany N. Hausey.

59.  In September 2020, Hausey (or someone using her ATM card) made the following structured cash ATM deposits to the Chase Bank located at #1 Brentwood Promenade Court, St. Louis, MO:

| Date | Card # | Type of Transaction | Amount |
|---|---|---|---|
| 09/08/2020 | 8956 | ATM Cash Deposit | $3,040.00 |
| 09/08/2020 | 8956 | ATM Cash Deposit | $2,320.00 |
| 09/08/2020 | 8956 | ATM Cash Deposit | $1,360.00 |
| 09/08/2020 | 8956 | ATM Cash Deposit | $1,260.00 |
| 09/09/2020 | 8956 | ATM Cash Deposit | $2,000.00 |
| 09/09/2020 | 8956 | ATM Cash Deposit | $2,000.00 |
| 09/09/2020 | 8956 | ATM Cash Deposit | $1,980,00 |
| 09/09/2020 | 8956 | ATM Cash Deposit | $1,960.00 |

60.  On September 15, 2020, Hausey (or someone with online access to her account) conducted an online transfer and moved $122,000.00 to account number 686878627 in the name Tiffany N.

31

Hausey, which carries the account address as "10526 Pico Vista Road, Downey, CA 90241" (**Subject Premises 1**).

61.   On March 31, 2021, Account 876017500 in the name Tiffany N. Hausey received a $4,500.00 Zelle Payment form Steven Sampler and a $4,000.00 Zelle Payment from Andae Investment Group, Inc.

62.   A review of account number 686878627 in the name Tiffany N. Hausey revealed that after Hausey (or someone that has online access to her account) transferred the $122,000.00 to account number 686878627, Hausey made a withdrawal to purchase the following Chase Cashier's Checks payable to James Johnson:

| Date Purchased | Check Number | Amount | Payee |
|---|---|---|---|
| 10/13/2020 | 1161148206 | $14,077.81 | James Johnson |
| 11/25/2020 | 9601204871 | $14,117.98 | James Johnson |

These were all deposited to Johnson-Polk's above-listed EMCCU account.

63.   On or about December 7, 2020 Hausey drafted check 1656 from account number 686878627 payable to Mercedes-Benz of Long Beach in the amount of $5,880.00 for a lease down payment on a vehicle. On September 29, 2021, members of the investigative team conducted surveillance on **Subject Premises 1**.  While present, a 2021 Mercedes Benz, CA License Plate: 8TZG843, registered to Hausey at the address of **Subject Premises 1**, was observed in the driveway.

64.   On or about February 13, 2021 Hausey drafted check 1657 from account number 686878627 payable to Penske Buick GMC

in the amount of $25,000.00 for the down payment on a vehicle that yes to be identified .

65.  On September 29, 2021, you agents ran a query through the FinCEN databases using Tiffany Hausey's identifies. According to FinCEN, on September 8, 2021, Hausey withdrew $12,000.00 in United States Currency from account number 686878627 in the name Tiffany N. Hausey that carries the account address as 10526 Pico Vista Road, Downey, CA 90241 (**Subject Premises 1).**

66.  As detailed further below in paragraph 73, the investigative team knows that drug traffickers involved in drug trafficking and money laundering amass a large amount of records, including bank account records described above. Financial institutions send monthly statements through both paper documents delivered to the residence, as well as electronic statements that are digitally sent. It is your affiant's belief that these records will be located within **Subject Premises 1**, including both paper documents and financial records that are kept in digital format.

B.         **Tax Return Summary**

67.  According to records received from the Internal Revenue Service, Andae Investment Group, LLC,  TIN 46-2849110, did not file a U.S. Return of Partnership Income (Form 1065) Return, or an Employer's Annual Federal Unemployment Tax Return (Form 940) for the years ending December 31, 2012, December 31, 2013, December 31, 2014, December 31, 2015, December 31, 2016, December 31, 2017 and December 31, 2018,  In addition, Andae

Investment Group, LLC,  TIN 46-2849110, did not file an
Employer's Quarterly Federal Tax Return for the quarters ending
March 31, 2012 through December 31, 2018.

68.  According IRS records, Andae Investment Group, Inc.,
TIN 80-1463947, did not file a U.S. Corporation Income Tax
Return (Form 1120) nor an Employer's Annual Federal Unemployment
Tax Return (Form 940) for the years ending December 31, 2017 and
December 31, 2018.  In addition, Andae Investment Group, Inc.,
TIN 80-1463947, did not file an Employer's Quarterly Federal Tax
Return for the quarters ending March 31, 2017 through December
31, 2018.

69.  According IRS records, Sampler, SSN: 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,
filed his U.S. Individual Income Tax Return (herein "tax
return") for the year ending December 31, 2013 (DLN:
79221506297344) electronically with the Internal Revenue Service
on or about April 15, 2014.  Sampler indicated that his
occupation was "Property" and no tax return preparer was listed.
Sampler reported his home address was 2832 Meramec Street, St.
Louis, MO 63118 and listed his filing status as "Single."
Sampler did not list any dependents on this tax return.  Sampler
did not list any income from Wages, Salaries (Line 7), Business
Income (Line 12) or Other Income (Line 21).  Instead, Sampler
reported Taxable Interest (Line 8a) of $77.00, Income from
rental real estate, Royalties and Partnerships (Line 17) of ($-
2,899.00).  However, the (-$2,899.00) in rental income resulted
from total rental income for the property located at 2832 – 2834
Meramec Street, St. Louis, MO 63118 totaling $1,200.00 less

34

total expenses related to the property of $4,099.00.  In addition, Sampler reported Social Security Benefits of $23,410.00, but none of those benefits were reported as taxable by Sampler.

70.  According IRS records, Sampler filed his U.S. Individual Income Tax Return (herein "tax return" for the year ending December 31, 2014 (DLN: 70221490827495) electronically with the Internal Revenue Service on or about March 31, 2015. Sampler signed the tax return for the year ending December 31, 2014 electronically on March 31, 2015.  Sampler indicated that his occupation was "Property" and no tax return preparer was listed.  Sampler reported his home address was 2832 Meramec St., St. Louis, MO 63118 and listed his filing status as "Head of Household."  Sampler listed Shania Sampler as the qualifying person for the Head of Household status.  Sampler did not list any dependents on this tax return.  Sampler did not list any income from Wages, Salaries (Line 7), Business Income (Line 12) or Other Income (Line 21).  Instead, Sampler reported Income from rental real estate, Royalties and Partnerships (Line 17) of $4,780.00.  However, the $4,780.00 in rental income resulted from total rental income for the property located at 2832 – 2834 Meramec Street, St. Louis, MO 63118 totaling $11,875.00 less total expenses related to the property of $7,095.00.  In addition, Sampler reported Social Security Benefits of $23,758.00, but none of those benefits were reported as taxable by Sampler.

71.  According IRS records, Sampler filed his U.S.
Individual Income Tax Return (herein "tax return" for the year
ending December 31, 2015 (DLN: 70221465581346) electronically
with the Internal Revenue Service on or about March 05, 2016.
Sampler signed the tax return for the year ending December 31,
2015 electronically on March 05, 2016.  Sampler indicated that
his occupation was "Property" and no tax return preparer was
listed.  Sampler reported his home address was 2832 Meramec St.,
St. Louis, MO 63118 and listed his filing status as "Head of
Household."  Sampler listed Shania Sampler as the qualifying
person for the Head of Household status.  Sampler did not list
any dependents on this tax return.  Sampler did not list any
income from Wages, Salaries (Line 7), Business Income (Line 12)
or Other Income (Line 21).  Instead, Sampler reported Income
from Rental real estate, Royalties and Partnerships (Line 17) of
$4,161.00.  However, the $4,161.00 in rental income resulted
from total rental income for the property located at 2832 – 2834
Meramec Street, St. Louis, MO 63118 totaling $15,600.00 less
total expenses related to the property of $11,439.00.  In
addition, SAMPLER reported Social Security Benefits of
$24,166.00, but none of those benefits were reported as taxable
by Sampler.

72.  According IRS records, Sampler filed his U.S.
Individual Income Tax Return for the year ending December 31,
2016 (DLN: 70221494912287) electronically with the Internal
Revenue Service on or about April 4, 2017.  Sampler indicated
that his occupation was "Property" and no tax return preparer

was listed.  Sampler reported his home address was 2832 Meramec
St., St. Louis, MO 63118 and listed his filing status as "Head
of Household."  Sampler listed Shania Sampler as the qualifying
person for the Head of Household status.  Sampler did not list
any dependents on this tax return.  Sampler did not list any
income from Wages, Salaries (Line 7), Business Income (Line 12)
or Other Income (Line 21).  Instead, Sampler reported Income
from Rental real estate, Royalties and Partnerships (Line 17) of
$5,760.00.  However, the $5,760.00 in rental income resulted
from total rental income for the property located at 2832 – 2834
Meramec Street, St. Louis, MO 63118 totaling $15,600.00 less
total expenses related to the property of $9,840.00.  In
addition, Sampler reported Social Security Benefits of
$24,159.00, but none of those benefits were reported as taxable
by Sampler.

73.  According IRS records, Sampler filed his U.S.
Individual Income Tax Return (herein "tax return" for the year
ending December 31, 2017 (DLN: 70221501546118) electronically
with the Internal Revenue Service on or about April 11, 2018.
Sampler signed the tax return for the year ending December 31,
2017 electronically on April 11, 2018.  Sampler indicated that
his occupation was "Property" and no tax return preparer was
listed.  Sampler reported his home address was 2832 Meramec St.,
St. Louis, MO 63118 and listed his filing status as "Head of
Household."  Sampler listed Shania Sampler as the qualifying
person for the Head of Household status.  Sampler did not list
any dependents on this tax return.  Sampler did not list any

income from Wages, Salaries (Line 7), Business Income (Line 12) or Other Income (Line 21).  Instead, Sampler reported Income from Rental real estate, Royalties and Partnerships (Line 17) of $8,773.00.  However, the $8,773.00 in rental income resulted from total rental income for the property located at 2832 – 2834 Meramec Street, St. Louis, MO 63118 totaling $15,600.00 less total expenses related to the property of $6,827.00.  In addition, Sampler reported Social Security Benefits of $24,230.00, but none of those benefits were reported as taxable by Sampler.

74.  According IRS records, Sampler filed his U.S. Individual Income Tax Return (herein "tax return" for the year ending December 31, 2018 (DLN: 70221668071449) electronically with the Internal Revenue Service on or about September 25, 2019.  Sampler indicated that his occupation was "Real Estate" and Thornton Tax Firm, LLC was listed as the tax return preparer for this tax return.  Sampler reported his home address was 2832 Meramec St., St. Louis, MO 63118 and listed his filing status as "Head of Household."  Sampler listed Shania Sampler as the qualifying person for the Head of Household status.  Sampler did not list any dependents on this tax return.  Sampler did not list any income from Wages, Salaries (Line 7), Business Income (Line 12) or Other Income (Line 21).  Instead, Sampler reported Income from Rental real estate, Royalties and Partnerships (Line 17) of $8,773.00.  However, the $8,773.00 in rental income resulted from total rental income for the property located at 2832 – 2834 Meramec Street, St. Louis, MO 63118 totaling

$15,600.00 less total expenses related to the property of $6,827.00.  In addition, Sampler reported Social Security Benefits of $24,230.00, but none of those benefits were reported as taxable by Sampler.

75.   According IRS records, Johnson-Polk has not filed a U.S. Individual Income Tax Return for the tax years ending December 31, 2014, December 31, 2015, December 31, 2016, December 31, 2017, or December 31, 2018.

## VI.   TRAINING AND EXPERIENCE;   DRUG TRAFFICKING AND MONEY LAUNDERING

76.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their

residences, vehicles, and other locations they frequent such as stash houses or hotel rooms.

      c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

      d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence, vehicles, and other locations they frequent such as stash houses or hotel rooms. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

      e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, vehicles, and other locations they frequent such as stash houses or hotel rooms.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence, vehicles, and other locations they frequent such as stash houses or hotel rooms, including in safes.  They also often keep other items related to their drug trafficking activities at their residence, vehicles, and other locations they frequent such as stash houses or hotel rooms, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence, vehicles, and other locations they frequent such as stash houses or hotel rooms, even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VII.  <u>TRAINING AND EXPERIENCE:   DOCUMENTS AND POSTAL RECORDS</u>

77.  I know through my training and experience in conducting long term conspiracy investigations involving trafficking narcotics through the USPS, that packages, packaging materials, receipts, mailing labels, and related shipping products remain within the residence.  A large amount of shipping materials is required to facilitate drug trafficking and receipts are provided during each mailing transaction.  Drug traffickers who mail the packages often keep these receipts because it contains the tracking number and they often send the tracking number, via text message or photograph, and retain the receipt if the package does not arrive to its intended destination.

78.  Three federal search warrants were obtained for packages mailed to Johnson-Polk at 11201 Otsego Street, Apartment 316, North Hollywood, California 91601.  Two search warrants, one federal and one state, were obtained for packages destined for **Subject Premises 1**.  Additionally, USPS Money Orders were mailed to Johnson-Polk on two separate occasions at **Subject Premises 1**, at the direction of Johnson-Polk, for the purchase of marijuana.  Over fifty USPS packages, which does not include packages from private companies, have been identified that have been mailed to Johnson-Polk at **Subject Premises 2**, the most recent being in July 2021.  These packages are consistent with other packages confirmed to contain U.S. Currency and other drug proceeds.  In my training and experience in investigating DTOs that ship and distribute narcotics through the mail, it is

routinely found that the monetary and illicit proceeds from the sale of those narcotics in non-source state areas are often mailed back to the DTO.  This is found whether the person is provided the narcotics on consignment or sends the monetary proceeds in advance of receiving the narcotic shipments.

79.  I have personally recovered receipts, packaging materials, and shipping labels, during the course of multiple long term investigations involving the conspiracy to distribute controlled substances.  Based on my training and experience, I believe there is probable cause that receipts, packaging materials, shipping labels, and related documents are located within the **Subject Premises**, as well as proceeds derivative of ongoing acts constituting the ongoing commission of the subject offenses.

VIII.  <u>**TRAINING AND EXPERIENCE ON DIGITAL**</u>
<u>**DEVICES**[3]</u>

1.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

2.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

3.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress James Johnson-Polk's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of James Johnson-Polk's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

80.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. <u>CONCLUSION</u>

81.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B-1, which constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy and possession with intent to distribute controlled substances) and Title 18, United States Code, Sections 1956 and 1957 (Money Laundering and Conspiracy to Commit Money Laundering) will be found at **Subject Premises 1**, as described in Attachment A-1 and the items listed in Attachment B-2, which constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 ///

(conspiracy and possession with intent to distribute controlled substances) and Title 18, United States Code, Sections 1956 and 1957 (Money Laundering and Conspiracy to Commit Money Laundering) will be found at **Subject Premises 2**, as described in Attachment A-2.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _____ day of _____, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

48